IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 25, 2014 Session

## CHARLES W. HENDRICKS v. LORI A. SMITH

**Appeal from the Juvenile Court for Hamilton County**
**No. 248546, 248547     Robert Philyaw, Judge**

**No. E2014-00893-COA-R3-JV-FILED-JANUARY 8, 2015**

This appeal arises from a dispute over child custody. Charles W. Hendricks ("Father") and Lori A. Smith ("Mother") entered into an agreed permanent parenting plan concerning their two minor children ("the Children"). Less than two weeks after entry of the plan, Father filed a motion for custody of the Children in the Juvenile Court for Hamilton County ("the Juvenile Court") alleging that the parenting plan had been procured by fraud as Mother had not disclosed that she worked as a licensed prostitute in Nevada. The Magistrate found a material change in circumstances and that it was in the best interest of the Children for Father to have custody. Mother appealed to the Juvenile Court. After a trial, the Juvenile Court found a material change in circumstances based on Mother's having worked as a prostitute and her having concealed that fact, as well as Mother's hostility to Father and the Children's stepmother. The Juvenile Court entered a permanent parenting plan designating Father as primary residential parent of the Children. Mother appealed to this Court. Because the Juvenile Court did not conduct a best interest analysis, we vacate the judgment of the Juvenile Court and remand for further proceedings as necessary.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Vacated;**
**Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Alan R. Beard, Chattanooga, Tennessee, for the appellant, Lori A. Smith.

Randall D. Larramore, Chattanooga, Tennessee, for the appellee, Charles W. Hendricks.

# OPINION

## Background

Mother and Father, parents of the Children, never were married. In 2011, Mother and Father entered into an agreed parenting plan which established Father's parentage and set a long-distance parenting schedule due to Mother's and the Children's move to Ohio.

Following conflicts over parenting time, Father filed a petition for contempt and to modify parenting plan in February 2012. Mother and Father entered into a conference to resolve their outstanding issues. In February 2013, Mother and Father executed a permanent parenting plan by agreement which, among other things, designated Mother as primary residential parent and set Father's support arrears. The Magistrate entered this agreed permanent parenting plan on March 1, 2013.

Less than two weeks later, on March 12, 2013, Father filed his motion for emergency temporary order of custody and for temporary restraining order. Among other things, Father alleged that the previous parenting plan had been procured by Mother through fraud. Specifically, Mother had not disclosed at the conference that she was working as a licensed prostitute in Nevada. Father belatedly had learned about this. After an August 2013 hearing, the Magistrate held that a material change of circumstances had occurred and that it was in the Children's best interest that they be placed with Father.

Mother appealed the Magistrate's ruling to the Juvenile Court. The Juvenile Court, as did the Magistrate, treated Father's petition as though it were a petition to modify the March 1, 2013 agreed parenting plan. Trial occurred in the Juvenile Court over the course of two days in October and December 2013. We will summarize the trial testimony as relevant to the issues on appeal.

Father testified. While the parties never married, they had dated exclusively for some period. Soon after their breakup, Father learned that Mother was pregnant. Their son was born in January 2009. At that time, Mother lived in Ohio and Father in Pennsylvania. In August 2009, Mother and Father resumed a relationship and moved to Chattanooga, Tennessee. In Chattanooga, Mother and Father lived at the maternal grandmother's home. The parties' second child, a daughter, was born in June 2010. The parties broke up in November 2010.

In March or April 2011, Father met Haley Fillers ("Fillers") through his job and they began a relationship. Father married Fillers in September 2011, despite Mother's

misgivings. Meanwhile, Mother wished to return to Ohio to finish her Master's Degree. Mother and Father entered into a parenting plan in Tennessee providing for Mother to move to Ohio with the Children. However, problems developed. Father testified that in August 2011, he visited Ohio to see the Children but could only see them at their daycare. Father was refused his parenting time during the 2011 Thanksgiving holiday. In January 2012, Father could not see the Children during a visit to Ohio because the Ohio Child Services agency was investigating Mother for abuse.[1]

In February 2012, Father filed a petition for contempt and modification based on the ongoing difficulties under the then existing parenting plan. In May 2012, Fillers, now Mrs. Hendricks, gave birth to a daughter. According to Father, Mother was not receptive to the new child and even stated that Father's and Mrs. Hendricks' daughter was not really the Children's sibling. After more squabbling over parenting time, the Children returned to Chattanooga and Father. The Children's luggage indicated that they had been in the western United States. Father did not understand what this was about. Father believed the Children had been with Mother in Ohio.

In February 2013, Mother and Father entered into a conference to resolve the petition filed earlier by Father. During the conference, Mother represented that she was working as an "independent contractor." A permanent parenting plan was agreed to and entered. In March 2013, a revelation broke. Father learned that Mother actually was working as a licensed prostitute in Nevada. Father did some research and discovered that Mother had been working as a licensed prostitute in Nevada since June 2012. Father additionally discovered that Mother had been working under the name Vivianna Leigh, a name very similar to the name of the parties' daughter. The Children returned to Chattanooga in mid-2013.

Mother testified. Mother presented her side of the controversy. According to Mother, she got deeper into debt while attending school in Ohio. Mother stated that Father did not consistently provide support for the Children. Father, as reflected in the 2013 Parenting Plan, was thousands of dollars in arrears for medical bills for the Children and child support. Mother aspired to work as a social worker but could not find any openings at first. In order to relieve her financial burden, Mother began work as a licensed prostitute at the Moonlight Bunny Ranch in Nevada. According to Mother, the Children were not exposed to her occupation. Mother denied that the Children suffered any abuse or neglect as a result of her work as a Nevada licensed prostitute, which she maintains she undertook for justifiable financial reasons. Regarding why she did not disclose her occupation in the

---

[1]Father testified that the investigation stemmed from a preschool teacher having reported that Mother "pushed them maybe or something." However, nothing appears to have come from the investigation.

lead-up to the 2013 agreed parenting plan, Mother stated that she was not asked about it. By the time of trial, Mother was out of the prostitution business and doing social work in Nevada after having received her master's degree in social work and her provisional license from the state of Nevada for social work.

Other relevant testimony was heard by the Juvenile Court. Numerous witnesses testified to the health and well-being of the Children under Father's care. The Children have access to an extended family in Chattanooga and excellent education facilities in that area. Trial testimony was elicited about Father's snorting cocaine in his house with a woman other than his wife while the Children and his and Mrs. Hendricks' daughter were asleep in the house. When asked where his wife/step-mom was while he and his female friend snorted cocaine in his house while his children were sleeping, Father testified: "She got herself into a -- she got picked up and she was in the drunk tank." Father also had cheated on Mrs. Hendricks with another woman before the marriage was even a year old. Over the course of this matter, Father had been promoted to a management position in the restaurant business.

In December 2013, at the end of the trial, the Juvenile Court stated the following:

All right. This case has been a little prolonged and I do want to review my notes before issuing a ruling in this case, but I do want to say a few things this afternoon. First, I want Mr. Hendricks and Ms. Smith to be assured that these Attorneys Larramore and Beard did an excellent job representing you in this difficult matter. You, on the other hand, I don't think did a very good job, either one of you. Both you parents need to grow up and put these children first before yourselves. This won't be part of my order, but frankly, I don't like either parents for the absolute best option for these children. I think you both need to grow up. Love her or hate her, love him or hate him, you-all brought children into this world together and that's not going to change, and all I heard through testimony, through written evidence, through recorded phone calls is vile, combative, just contradictory to having your children's best interest, and I'm telling you both you got to grow up. You got to look out for these children, not just for the next 13 years for [your son] or 16 years for [your daughter], forever you-all are bound together because you brought these children into this world together, and so you're going to have to talk, you're going to have to get along. You're going to have to get along with his wife as much as you hate her. She is the stepmom of these children as of today. That might change next year, that might not ever change, I don't know. But if you love your children, you're going to have to find a way around that, and I could

say some similar things to you. You-all are going to have to learn to communicate. I'll issue a ruling before the end of the week.

In April 2014, the Juvenile Court entered its final judgment, incorporating a permanent parenting plan designating Father as the primary residential parent and providing Mother with a long-distance visitation schedule. The Juvenile Court also incorporated its memorandum order of December 2013, wherein the court stated in relevant part:

> At the time of the hearing before the Magistrate on August 1, 2013, Mother was still working full-time as a legal prostitute in Nevada. At the time of the rehearing, Mother testified that she is now working full-time as a social worker in Nevada.
>
> Although Mother testified that she has no plans to work as a prostitute any more, there apparently is no other reasonable tie for her in Nevada. Mother's extended family is in Chattanooga. Father's wife's extended family is in Chattanooga. It is the Court's opinion that Mother lacks integrity on several issues, including this one.
>
> While both Father and Mother have at times acted irresponsibly and seemed to lack sound parenting judgment, the Court finds that there was a material change in the circumstances of the children because of Mother's deceit, Mother's occupation as a prostitute, and Mother's hostility toward Father and his wife.
>
> The Order resulting from the Magistrate's findings is **AFFIRMED**. Any outstanding issue on contempt is **DENIED.**

Notably, at no point in its order did the Juvenile Court specifically conduct a statutory best interest analysis of any sort. The Juvenile Court denied both sides their attorney's fees. Mother timely appealed to this Court.

## Discussion

Although not stated exactly as such, Mother raises one issue on appeal: whether the Juvenile Court erred in awarding custody of the Children to Father. Father raises his own issue of whether the Juvenile Court erred in failing to award him his attorney's fees. Father also requests his attorney's fees incurred on appeal.

Our review is *de novo* upon the record, accompanied by a presumption of

correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

Our Supreme Court has stated: "In assessing a petition to modify a permanent parenting plan, the court must first determine if a material change in circumstances has occurred and then apply the 'best interest' factors of section 36-6-106(a)." *Armbrister v. Armbrister,* 414 S.W.3d 685, 697-98 (Tenn. 2013). We note that the Tennessee General Assembly has consolidated and modified the multiple best interest factors at Tenn. Code Ann. § 36-6-106. These changes were effective July 1, 2014. The final judgment in this case was entered in April 2014.

Initially, we observe the unusual procedural nature of this case. Father's petition for custody was filed less than two weeks after entry of the agreed permanent parenting plan of March 1, 2013. In this respect, the petition seems more in the nature of a motion to alter or amend judgment. Nevertheless, both sides and the Juvenile Court have treated the petition as though it were for a change in custody based on a material change in circumstances. Despite this consensus, Father's 2013 petition in reality was a Tennessee Rules of Civil Procedure rule 59 motion to alter or amend the not yet final March 2013 entry by the Juvenile Court of the agreed permanent parenting plan. At this juncture, the March 2013 permanent parenting plan forfeited its "agreed" status. The rather confusing history of this case bears some illumination. The parties entered into a permanent parenting plan in 2011. Father, dissatisfied with the functioning of the plan, filed a petition to modify in 2012. The 2013 permanent parenting plan, agreed early on though it was, represented a modification of the 2011 plan. Father's petition, inaptly named as it was, filed some two odd weeks after entry of the 2013 permanent parenting plan, represented a motion to alter or amend the March 2013 modification of the 2011 permanent parenting plan. Father's 2013 petition was not a petition to modify in itself but was a motion to alter or amend the 2013 modification. Therefore, the Juvenile Court properly considered evidence dating back to the entry of the 2011 permanent parenting plan. In any event, a flaw in the record prevents us from properly reviewing the new permanent parenting plan.

From our review of the record, we find no best interest analysis from the Juvenile Court. Regarding the impact on appellate review of a lack of best interest analysis from a trial court in custody determination cases, this Court has stated:

> This Court has previously held that a custody determination on behalf of a
> child is a "fact-intensive issue" that requires detailed findings of fact and

conclusions of law by the trial court. *See Pandey v. Shrivastava*, No. W2012-00059-COA-R3-CV, 2013 WL 657799, at *5 (Tenn. Ct. App. Feb. 22, 2013) (concerning parental relocation) (citing Tenn. R. Civ. P. 52.01 (requiring findings of fact and conclusions of law in bench trials)). In similar cases, this Court has vacated the judgment of the trial court where the court failed to make findings to support its rulings or where it failed to engage in a best interest analysis. *See, e.g., Iman v. Iman*, No. M2012-02388-COA-R3-CV, 2013 WL 7343928, at *13 (Tenn. Ct. App. Nov. 19, 2013) (vacating the judgment of the trial court when it failed to make appropriate findings of fact and failed to "make an explicit finding that modification was in the child's best interest"); *Pandey*, 2013 WL 657799, at *5-*6 (vacating based on the lack of findings); *Hardin v. Hardin*, No. W2012-00273-COA-R3-CV, 2012 WL 6727533, at *5 [ (Tenn. Ct. App. Dec. 27, 2012) (vacating based on the trial court's failure to make a finding that modification of the parenting plan was in the child's best interest).

This Court has previously held that the General Assembly's decision to require findings of fact and conclusions of law is "not a mere technicality." *In re K.H.*, No. W2008-01144-COA-R3-PT, 2009 WL 1362314, at *8 (Tenn. Ct. App. May 15, 2009). Instead, the requirement serves the important purpose of "facilitat[ing] appellate review and promot[ing] the just and speedy resolution of appeals." *Id.; White v. Moody*, 171 S.W.3d 187, 191 (Tenn. Ct. App. 2004); *Bruce v. Bruce*, 801 S.W.2d 102, 104 (Tenn. Ct. App. 1990). "Without such findings and conclusions, this court is left to wonder on what basis the court reached its ultimate decision." *In re K.H.*, 2009 WL 1362314, at *8 (quoting *In re M.E. W.*, No. M2003-01739-COA-R3-PT, 2004 WL 865840, at *19 (Tenn. Ct. App. April 21, 2004)). In this case, the trial court failed to make any findings regarding the best interest of the child. Best interests, however, is the "paramount consideration," the "pole star, the alpha and omega," of any child custody determination. *Bah v. Bah*, 668 S.W.2d 663, 665 (Tenn. Ct. App. 1983). Without findings indicating that the trial court made a best interest analysis in refusing to allow the child to relocate with Father and subsequently awarding custody, and the majority of parenting time, to Mother, the trial court did not apply "the correct legal standards to the evidence found in the record." *Eldridge*, 42 S .W.3d at 88 (citing *State ex. rel Vaughn v. Kaatrude*, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000)).

*Aragon v. Aragon*, No. M2013-01962-COA-R3-CV, 2014 WL 1607350, at *9 (Tenn. Ct. App. Apr. 21, 2014), *no appl. perm. appeal filed*.

We decline to overlook the absence of a best interest analysis and search for evidence in the record supporting the Juvenile Court's decision. Instead, we vacate the Juvenile Court's judgment and remand this case for the Juvenile Court to enter a permanent parenting plan after considering all relevant factors and making a best interest analysis. We decline at this stage to render any decision regarding whether the Juvenile Court erred in finding a material change in circumstances.

We next address whether the Juvenile Court erred in declining to award Father attorney's fees. Since we are vacating the judgment of the Juvenile Court for lack of a best interest analysis, this issue is moot and pretermitted.

Finally, we decline to award either party attorney's fees incurred on appeal. The judgment of the Juvenile Court is vacated for lack of a best interest analysis.

## Conclusion

The judgment of the Juvenile Court is vacated, and this cause is remanded to the Juvenile Court for collection of the costs below and for proceedings, as necessary, consistent with this Opinion. The costs on appeal are assessed equally against the parties: one-half against the Appellant, Lori A. Smith, and her surety, if any; and, one-half against the Appellee, Charles W. Hendricks.

_____
D. MICHAEL SWINEY, JUDGE